UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.           )<br>)<br>ROBERT GADIMIAN, )<br>  a.k.a. Robert Ghadimian, )<br>)<br>  Defendant. )<br>)<br>)<br>)<br>)<br>)<br>) | CRIMINAL NO. 16 Cr 10285<br><br>VIOLATIONS:<br><br>Securities Fraud<br>(15 U.S.C. § 78j(b) & 78ff;<br>17 C.F.R. § 240.10b-5)<br><br>Criminal Forfeiture Allegation<br>(18 U.S.C. § 981(a)(1)(C) & 28 U.S.C.<br>§ 2461(c)) |

INDICTMENT

The Grand Jury charges that:

GENERAL ALLEGATIONS

At all times relevant to this Indictment

Individuals and Entities

1.   The defendant, ROBERT GADIMIAN, also known as Robert Ghadimian ("GADIMIAN"), was in individual who resided in Burbank, California.

2.   Puma Biotechnology, Inc. ("Puma") was a biopharmaceutical company based in Los Angeles, California whose principal focus was the development of a breast cancer drug called "neratinib." Puma was a publicly-traded company. Its shares were traded on the New York Stock Exchange, a national securities exchange, under the ticker symbol "PBYI."

3.   From in or about November 2011 until in our about October 2014, GADIMIAN was employed at Puma as the Senior Director of Regulatory Affairs. In that position,

1

GADIMIAN worked on, among other things, the drug production process (called "chemical manufacturing") as well as regulatory and clinical issues.

4. "Company A" was a multinational life sciences consulting firm that managed clinical trials for pharmaceutical companies including Puma. Company A was headquartered in Waltham, Massachusetts and maintained computer servers for its employees in the United States in Billerica, Massachusetts.

5. Fidelity Brokerage Services, LLC ("Fidelity") was financial services corporation headquartered in Boston, Massachusetts.

### The Drug Trials

6. By federal law, the U.S. Food and Drug Administration ("FDA") is required to approve any new drug before it can be marketed and sold in the United States. In order to obtain approval for a new drug, applicants are required to submit a New Drug Application ("NDA") to the FDA. Before a NDA maybe submitted, the FDA requires a series of clinical trials, commonly known as Phase I, Phase II and Phase III trials, to ensure, among other things, the safety and efficacy of the new drug.

7. By at least November 2011, Puma was involved in several ongoing clinical drug trials for neratinib, including a Phase II trial known as the "I-SPY 2 trial" and a Phase III trial known as the "ExteNET trial" or "3004 trial" (the "3004 trial").

8. Company A helped manage the clinical data for the 3004 trial. While the 3004 trial was conducted at sites around the world, confidential data about the trial's results was communicated to Puma through Company A's computer servers in Billerica, Massachusetts.

## The Insider Trading Scheme

9.     As he well knew, GADIMIAN had a fiduciary duty to Puma and its shareholders not to misuse the company's material, non-public information for personal gain.  GADIMIAN also knew that Puma maintained an insider trading policy that required all employees to obtain preclearance from senior management before trading in Puma securities and flatly prohibited any such trading during certain, well-defined "blackout periods."

10.    By virtue of his position at Puma, GADIMIAN learned material, non-public information about Puma's ongoing drug trials.

11.    On various dates between in or about August 2013 and July 2014, and while in the possession of material, non-public information about the results of the I-SPY 2 trial and the 3004 trial, GADIMIAN executed trades in Puma securities using two different accounts at Fidelity.

12.    GADIMIAN executed these trades without obtaining preclearance from Puma because he knew and believed that Puma would deny his request and that his trades were in violation of Puma's insider trading policy.

**A.     The I-SPY 2 Trial**

13.    In or about early 2013, GADIMIAN attended bi-monthly meetings of Puma's steering committee.  During these meetings, GADIMIAN learned that neratinib was performing well in the I-SPY 2 trial.  GADIMIAN knew that the positive results of the I-SPY 2 trial were not yet public.

14.    Between in or about August 26, 2013 and September 6, 2013, GADIMIAN purchased a total of 4,918 shares of Puma stock worth approximately $261,500.  GADIMIAN

3

made the purchases while in possession of material, non-public information about the expected positive results of the I-SPY 2 trial. In particular, from his two Fidelity accounts, GADIMIAN made the following trades:

    a. On or about August 26, 2013, GADIMIAN purchased 1,200 shares of Puma stock for $51.50 per share; 1,400 shares of Puma stock for $52.50 per share; and another 500 shares of Puma stock for approximately $52.50 per share.

    b. On or about August 29, 2013, GADIMIAN purchased 23 shares of Puma stock for $51.70 per share and another 410 shares of Puma stock for $51.75 per share.

    c. On or about September 3, 2013, GADIMIAN purchased 380 shares of Puma stock for $52 per share.

    d. On or about September 5, 2013, GADIMIAN purchased 305 shares of Puma stock for $56.57 per share.

    e. On or about September 6, 2013, GADIMIAN purchased 700 shares of Puma stock for $57.85 per share.

15. GADIMIAN did not seek or obtain preclearance for his trades. Moreover, at the time of the trades, GADIMIAN knew that Puma was in a "blackout" period that prohibited GADIMIAN from making any trades in Puma securities.

16. On or about December 4, 2013, after the stock market closed, Puma announced positive "top line" or preliminary results for neratinib in the I-SPY 2 trial. Before the announcement, on or about December 4, 2013, Puma's stock price closed at $46.21 per share. The

next day, on or about December 5, 2013, Puma's stock price closed at $77.70 per share, an increase of approximately 68 percent.

17. The same day as the announcement, on or about December 5, 2013, GADIMIAN sold all 4,918 shares of Puma stock that, as described above, he purchased in August and September 2013, earning a profit of approximately $95,000.

### B. The 3004 Trial

18. By virtue of his position at Puma, GADIMIAN was also involved in the 3004 trial. In particular, GADIMIAN was a member of a team (the "3004 Project Team") that included employees of both Puma and Company A. GADIMIAN regularly attended bi-monthly meetings of the 3004 Project Team during which he learned material, non-public information about the progress of the 3004 trial, including the timeline for the trial's conclusion.

19. On or about March 12, 2014, GADIMIAN received an email from Company A, addressed to a neratinib project team, about a teleconference the next day. The email contained material, non-public information about the 3004 trial, including a proposal to schedule the trial's "soft lock" date for May 23, 2014. The soft-lock date was the date on which data from the trial would be captured and then analyzed to determine whether neratinib was effective.

20. Two days later, on or about March 14, 2014, GADIMIAN received an email from a Puma employee about a 3004 Project Team teleconference that day. One of the items on the agenda was a proposal to schedule delivery of the top-line results of the 3004 trial on or about June 6, 2014.

21. From his position at Puma, GADIMIAN well knew that the preliminary or "top-line" analysis of the 3004 trial could be "do or die" for the company. GADIMIAN also knew, based on material non-public information he obtained as a senior Puma executive—including information about Puma's substantial investment in the 3004 trial—that results of the 3004 trial were likely to be favorable. Finally, GADIMIAN knew that both the "soft lock" date and the date on which the 3004 trial results would be delivered themselves constituted material, non-public information because, if the drug was determined to be safe and effective, those dates would establish a time-line for possible approval of neratinib by the FDA.

22. As further detailed below, between in or about March 14, 2014 and March 18, 2014, GADIMIAN purchased a total of 1,850 shares of Puma stock worth approximately $215,880. GADIMIAN made the purchases while in possession of material, non-public information about the 3004 trial. GADIMIAN also knew that under Puma's insider trading policy, Puma was in a "blackout" period that, at that time, prohibited GADIMIAN from making any trades in Puma securities. GADIMIAN did not seek or obtain pre-clearance from Puma for the trades.

23. In particular, from his two Fidelity accounts, GADIMIAN made the following trades:

   a. On or about March 14, 2014, GADIMIAN purchased 201 shares of Puma stock for approximately $115.43 per share; 200 shares of Puma stock for approximately $115.55 per share; 500 shares of Puma stock for approximately $115.68 per share; 99 shares of Puma stock for $115.73 per share; and another 450 shares of Puma stock for $115.37 per share.

      b.    On or about March 18, 2014, GADIMIAN purchased 400 shares of Puma stock for $120.83 per share.

    24.    While originally scheduled for May 23, 2014, the date of the "soft lock" was delayed for several weeks. On or about July 8, 2014, GADIMIAN received an email from a Puma Vice President and the project leader for the 3004 Project Team announcing, "This afternoon we have completed our database soft lock" for the 3004 trial. The email described the "soft lock" as "great news" and GADIMIAN well knew that the information was both material and non-public.

    25.    Between on or about July 10, 2014 and July 14, 2014, GADIMIAN purchased a series of short-term Puma call options. Call options are contracts that permit the buyer to purchase shares of a stock at a fixed "strike price" on or before a certain date. They reflect a bet that the stock price will increase before the option expires. GADIMIAN made the following purchases through his accounts at Fidelity:

      a.    On or about July 10, 2014 and July 11, 2014, GADIMIAN purchased 14 Puma call options (100 shares each) with strike prices of between $90 and $95, expiring on August 16, 2014.

      b.    On or about July 14, 2014, GADIMIAN bought an additional 57 Puma call options (100 shares each) with strike prices between $90 and $95, expiring on August 16, 2014.

    26.    At the time GADIMIAN purchase the options, Puma's stock was trading at approximately $65 per share.

27.     On or about July 22, 2014, after the market closed, Puma publicly announced positive top-line results from the 3004 trial.  On or about July 22, 2014, before the public announcement, Puma's stock price closed at $59.03 per share.  The next day, after the announcement, Puma's stock price closed at $233.43 per share, an increase of approximately 295 percent.

28.     On or about July 23, 2014, GADIMIAN sold all 71 Puma call options that he had purchased, realizing a profit of approximately $910,000.

29.     On or about July 24, 2014, GADIMIAN sold 1,000 shares of Puma stock in one of his Fidelity accounts and realized an additional profit of $96,000.

## COUNTS ONE THROUGH SEVEN
(Securities Fraud)

30.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 29 of this Indictment and further charges that:

31.     On our about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

**ROBERT GADIMIAN,**
a.k.a. Robert Ghadimian,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme, or artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of securities of Puma, specifically, by willfully engaging in a scheme to trade in Puma securities on the basis material, non-public information about Puma's ongoing clinical drug trials.

| COUNT | DATE | TRANSACTION |
|---|---|---|
| 1. | August 26, 2013 | Purchase of 3,100 shares of Puma stock |
| 2. | August 29, 2013 | Purchase of 23 shares of Puma stock |
| 3. | September 3, 2013 | Purchase of 380 shares of Puma stock |
| 4. | September 5, 2013 | Purchase of 305 shares of Puma stock |
| 5. | September 6, 2013 | Purchase of 700 shares of Puma stock |
| 6. | July 10 and 11, 2014 | Purchase of 14 Puma call options (100 shares each) |
| 7. | July 14, 2014 | Purchase of 57 Puma call options (100 shares each) |

All in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a); Title 17, Code of Federal Regulations, Section 240.10-b.

## SECURITIES FRAUD FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds probable cause to believe that:

32. Upon conviction of one or more of the offenses in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a), set forth in Counts One through Seven of this Indictment,

**ROBERT GADIMIAN, a.k.a. Robert Ghadimian**

the Defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses. The property to be forfeited includes, but is not limited to, the following:

   (a) all funds on deposit up to $1,101,000 in Scottrade Financial Services, Inc. account number ending in 7849 in the name of Robert Ghadimian.

33. If any of the property described in Paragraph 39, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission by the defendant –

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of this Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of all other property

11

of the defendants up to the value of the property described in Paragraph 39 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Neil J. Gallagher, Jr.
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS; September 28, 2016

Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK    9/28/2016

@3:55pm